IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA,

    Plaintiff,

  v.

VALERO ENERGY CORPORATION,
VALERO ENERGY PARTNERS LP, and
PLAINS ALL AMERICAN PIPELINE, L.P.,

    Defendants.

No. C 17-03786 WHA

**ORDER RE MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

In this antitrust action to enjoin an acquisition of petroleum storage terminals, California moves for a preliminary injunction. Defendant companies oppose. For the reasons below, and subject to conditions set forth herein, the motion is **DENIED**.

## STATEMENT

There is no need for a preliminary injunction since, if a permanent injunction is granted, it will be easy to restore the status quo. No irreparable injury will occur between now and judgment.

This action arises from the pending sale of two petroleum storage terminals in the Bay Area, one in Martinez, the other in Richmond. The terminals are currently owned and operated by defendant Plains All American Pipeline, L.P., which stores and transports light petroleum products ("LPPs") — *e.g.* gasoline, diesel, and jet fuel — for LPP sellers such as Valero (Amd.

Compl. ¶ 19*;* Hayes Decl. at 3). Plains does not sell LPPs itself, and is therefore considered an "independent" terminal operator.

In September 2016, Plains entered into an agreement to sell its terminals to Valero Energy Partners LP ("Valero Partners"), a limited partnership that owns and operates gasoline assets including terminals and pipelines, mostly on the Gulf Coast (Lashway Decl. ¶¶ 1, 20). Defendant Valero Energy Corporation ("Valero") owns approximately 68 percent of Valero Partners, and owns all of its general partnership shares (*id.*; Amd. Compl. ¶ 18; Moore Reply Decl. Exh. C at 9). Outside investors own the remaining 32 percent of the limited partnership shares in Valero Partners; however, the investors have agreed to provisions that permit Valero to manage Valero Partners in such a way that will directly benefit Valero. The investors have also waived certain fiduciary duties that they would otherwise be owed, which waiver gives Valero power to control Valero Partners' operations (Moore Reply Decl., Exh. A at 14, Exh. C at 14). Though Valero does not sell terminaling services in the Bay Area, it does own a refinery in Benicia, which ships gasoline and other LPPs throughout Northern California and Northern Nevada via the Kinder Morgan pipeline system.

California argues that, should Plains and Valero Partners consummate their sales agreement, the Valero entities will be able to exercise undue control over the market for gasoline and other LPP shipments and manipulate the market to drive up downstream prices. To assess the potential effects of this transaction, this order briefly describes LPP terminal operations in the Bay Area and then turns to the details of the proposed sale.

**1.  TERMINAL OPERATIONS IN THE BAY AREA.**

Terminals in the Bay Area receive gasoline and other LPPs via pipeline, transport barges, trucks, or railcar. The terminals then transport the gasoline via those same methods to regions outside of the Bay Area. The most efficient way to transport gasoline and other LPPs from the Bay Area to Northern California and Northern Nevada is via pipeline (Hayes Decl. at 10; Amd. Compl. ¶¶ 24–26, 29).

This pipeline movement from Bay Area terminals to the wider region beyond is a two-step process. The terminals must first pipe gasoline and other LPPs to the Concord Station,

2

a conduit that connects the Bay Area to the rest of the region.  This is accomplished by sending shipments over shorter pipelines, referred to as "gathering lines," that run from the terminals around the Bay Area to the Concord Station.  Once gasoline and other LPPs reach the Concord Station, they are then transported via the Kinder Morgan pipeline system to locations in Northern California and Northern Nevada, referred to as the Kinder Morgan Service Area ("KMSA").

There are seven gathering lines that run from Bay Area terminals to the Concord Station. These include (1) the Richmond Line, (2) the Rodeo Line, (3) the Tesoro Diesel Line, (4) the Tesoro Gas Line, (5) the Shell Line, (6) the Valero Line, and (7) the Plains line (Hayes Decl. at 5–6, Exhs. 1, 2).  The capacity of each of these lines is set forth in the chart below (*id.* Exh. 2):

**Capacity by Gathering Line**
*Pipelines to Kinder Morgan's Concord Station*

| Gathering Line | Capacity (Barrels/Day) | Percent of Total Capacity |
|---|---|---|
| Valero | ■ | ■ |
| Shell | ■ | ■ |
| Tesoro Diesel | ■ | ■ |
| Tesoro Gas | ■ | ■ |
| Plains | ■ | ■ |
| Rodeo | ■ | ■ |
| Richmond | ■ | ■ |
| **Total** | | |

Eight businesses, five of which are refineries, and three of which are storage terminals with no refining capabilities, have access to these gathering lines as set forth in the chart below (*id.* at 5–6):

**Terminal/Refinery Access to Gathering Lines**
*Gathering Lines Connecting Terminals/Refineries to Concord Station*

| Gathering Line | Terminal/Refinery |
|---|---|
| Valero | Valero Refinery |
| Shell | Shell Refinery |
| Tesoro Diesel | Tesoro Refinery |
| Tesoro Gas | Tesoro Refinery |
| Plains | Martinez Terminal |
| Rodeo | (1) Phillips 66 Refinery<br>(2) NuStar Selby Terminal |
| Richmond | (1) Chevron Refinery<br>(2) Kinder Morgan Terminal |

3

Chevron also operates a separate proprietary pipeline with access to certain locations throughout the Bay Area, though it does not reach as many locations or have as much capacity as the Kinder Morgan pipeline system (*id*. at 4). The Chevron pipeline has a capacity of approximately ■ barrels per day. When the Chevron pipeline is factored into the mix, the percentage of throughput capacity to the KMSA held by each company shifts slightly, such that Valero already controls ■ percent of the throughput capacity and Plains controls ■ percent (*see* Hayes Decl. at 6–7, Exh. 5).

The five refiners with gathering line access transport only their own product, whereas the three independent terminals contract to ship product provided by outside gasoline and LPP suppliers including both refiners and LPP traders lacking downstream retail operations. Two of the three independent terminals, NuStar and Kinder Morgan, generally operate at capacity and therefore cannot, on a regular basis, ship additional LPPs to Concord Station. Among the independent terminals, only the Martinez terminal typically has additional capacity to ship gasoline and other LPPs for third parties (*id*. 6–7).

### 2. THE 2005 FTC ORDER.

In 2005 Valero attempted to acquire the Martinez and Richmond terminals — the same two terminals that are the subject of this action — as part of a much larger transaction involving additional terminals and pipeline systems throughout the United States. Valero was investigated by the FTC and California, and ultimately agreed to divest the Martinez and Richmond terminals, as well as other assets, pursuant to a consent order to rectify competition concerns. Valero remained bound by the consent order until July 2015 (Amd. Compl. ¶¶ 7–8; Moore Decl. Exh. B).

### 3. THE PROPOSED SALE.

In September 2016, a little over a year after the consent order expired, Valero Partners entered into this agreement to purchase the Martinez and Richmond terminals from their current owner, Plains. The Martinez terminal is the key disputed asset. It pipes gasoline and other LPPs to Concord Station for transport via the Kinder Morgan pipeline system. Chevron and BP

4

are the two largest Plains customers, and in 2015 and 2016 accounted for ▮▮▮▮▮ of the gasoline and diesel transported from the Martinez terminal to the Concord Station. Energy traders such as AOT Energy Americas, LLC, and Musket Corporation also use the Martinez terminal to reach the Concord Station. These traders buy fuel when prices are low and sell when prices are high. This trading strategy can moderate downstream fuel prices, or so California contends (Br. at 6; Hayes Decl. at 8–9).

The Richmond terminal is much smaller than the Martinez terminal and, critically, not capable of delivering LPPs to the Kinder Morgan pipeline. It is therefore not part of the present dispute (*see* Movafagian Decl. ¶ 12).

### 4. FTC INVESTIGATION AND PROCEDURAL HISTORY.

After the pending sale was announced in September 2016, the FTC and California began a joint investigation of the proposed transaction. At the conclusion of its investigation, the FTC did not take any action to block the sale, possibly due to a shortage of commissioners (Oliver Decl. ¶¶ 6–9; *see* Reply at 1).

On June 30, the day before the sale was to close, California filed a complaint and motion for temporary restraining order seeking to enjoin the sale; however, it immediately withdrew the complaint and entered into negotiations with defendants, who agreed to delay the closing to see whether the parties could reach a settlement. The parties were unable to reach a resolution, and California re-filed its motion along with an amended complaint on July 10. The motion was denied without prejudice to California bringing a motion for a preliminary injunction (*see* Dkt. Nos. 1, 4–5, 13).

California now moves for a preliminary injunction, arguing that the proposed sale will have anticompetitive effects in violation of Section 7 of the Clayton Act and Section 17200 of the California Business and Professions Code, which will irreparably harm LPP consumers in Northern California. This order follows full briefing and oral argument. Both sides have agreed to a trial date of January 8, 2018.

## ANALYSIS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. In our circuit, this four-part test is also satisfied if "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor" so long as there is also a likelihood of irreparable harm and an injunction would be in the public's interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citations and quotations omitted).

### 1. LIKELIHOOD OF SUCCESS ON THE MERITS.

#### A. Clayton Act Claim.

A transaction violates Section 7 of the Clayton Act, if its effect may "substantially [] lessen competition, or [] tend to create a monopoly" in "any line of commerce or . . . activity affecting commerce in any section of the country." To satisfy Section 7, a loss of competition must be "sufficiently probable and imminent." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 n.22 (1974).

California has at least raised serious questions regarding whether the proposed transaction will have anticompetitive effects in the market for bulk sales of gasoline and other LPPs in Northern California and Northern Nevada. Valero already controls one of seven gathering lines accounting for approximately ▮▮▮▮▮▮ of the throughput capacity running to the KMSA. Now — through Valero Partners — it will control a second, which will give it another ▮▮▮▮▮▮ of the throughput capacity. The danger is, of course, that Valero will use this control to further its own economic interest. If the sale closes, Valero will control more pipeline access into the KMSA than all but one company, Tesoro (*see* Hayes Decl. at 6–7, Exhs. 2, 5). It will control the last independently operated gathering line with unused capacity, and the only one capable of delivering gasoline and other LPPs during periods of increased demand (*see id.* at 6–7). This raises serious concerns that the transaction will lead to higher prices at the pump.

6

Defendants make several arguments to the contrary, none of which overcome these serious concerns. Defendants first take issue with California's treatment of Valero Partners and Valero as a single entity with unified economic incentives, observing that Valero Partners has independent investors who have incentives to expand terminal operations and to whom it owes a separate duty (Opp. at 14; Lashway Decl. at 1, ¶ 4, Exh. 1; Bhullar Decl. ¶ 13). Defendants' contention, however, is belied by Valero Partners' own public disclosures.

These disclosures reveal that Valero Partners has taken steps to assure that Valero will be able to exercise control over its operations and use Valero Partners for its own financial benefit. When it went public in 2013, Valero Partners disclosed that "Because the officers and directors of our general partner are also directors and/or officers of Valero, [they] have fiduciary duties to Valero that may cause them to pursue business strategies that disproportionately benefit Valero or which otherwise are not in [Valero Partners'] best interests." Valero Partners further explained to its investors that Valero "may determine to manage [Valero Partner's] business in a way that directly benefits Valero's refining or marketing business." These actions, Valero Partners explained, are permitted under the partnership agreement "and will not be a breach of any duty of our general partner" (Reply at 2–3; Moore Reply Decl. Exh. C at 14, 17). Valero Partners' Form 10-K for 2016 also demonstrates that it currently receives all of its revenues from Valero, and states that it "expects to continue to derive a substantial amount of [its] revenues from Valero for the foreseeable future" (Lashway Decl. Exh. 1 at 3).

These and other public disclosures show that the ties between Valero Partners and Valero are significant, and Valero has ensured that it can advance its own business interests through the business of Valero Partners. Defendants' argument that the two companies should be treated as independent of one another is unavailing.

Nor do defendants' assurances that Valero Partners intends to operate the Martinez terminal "in the same way as Plains, by continuing to maximize third-party throughput" provide any comfort (*see* Opp. at 1, 14; Lashway Decl. ¶¶ 7–10). The Court has learned over decades of experience that assurances of good intentions get cast aside once deals are done and the glare of

scrutiny has passed. Defendants' assurances today do little to protect consumers from anticompetitive behavior in the long term.

Moreover, the existing third-party contracts that defendants point to, which will ostensibly prevent them from exercising control over LPP throughput, are time-limited (*see* Opp. at 14, 21; Lashway Decl. ¶ 19; Movafagian Decl. ¶ 19). They begin to expire in ████ ████████ at which point Valero may redirect gathering line capacity to its own selfish ends. While these existing contracts have long terms yet to run, we are, in fact, concerned for the long term and must consider what will happen once these contracts have run their course.

Defendants further argue that even in the event that Valero Partners tries to raise prices, it would not have sufficient market share to do so. They point to evidence ostensibly showing that Bay Area refineries produce a large enough volume of excess gasoline and other LPPs to replace any shortfall from both the Valero refinery and the Martinez terminal (Opp. at 16; Bailey Decl. ¶¶ 49–56). But the evidence actually shows the opposite. When Valero shut down its refinery for scheduled maintenance in January and February of 2016, other LPP sellers were unable (or unwilling) to completely replace the shortfall (Reply at 10; Hayes Reply Decl. at 27–28, Exhs. 8–9). When compared with 2016, during which no shutdown occurred, approximately 500,000 fewer barrels were transported to the KMSA during Valero's two-month absence from the market. Other refinery outages have similarly led to shortfalls in the LPP market and led to increased LPP prices (*see* Hayes Reply Decl. at 29–34). Valero's control of two pipelines in the system will give it the ability to generate shortfalls that its competitors cannot fill, or so the present record indicates.

**B. Section 17200 Claim.**

California further claims that the proposed transaction violates Section 17200 of the California Business and Professions Code.

To establish a Section 17200 claim predicated on a violation of federal antitrust law, whether under the unfair or unlawful prong, the claim must "threaten an incipient violation of an antitrust law" or have "effects . . . comparable to or the same as a violation of the law, or [that] otherwise significantly threaten[] or harm[] competition." *Cel Tech Commc'ns, Inc. v.*

*Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). Therefore, the analysis under Section 17200 proceeds along the same lines as the analysis under the Clayton Act, and this order finds California has raised serious questions regarding its Section 17200 claim for the same reasons stated above.

### 2.  IRREPARABLE HARM?

The party seeking a preliminary injunction must also show a likelihood of irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. This requires it to "demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citations and quotations omitted). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff is likely to suffer irreparable harm before a decision on the merits can be rendered." *Id.* at 1023.

Here, all parties have agreed to a trial on the merits in a little over four months. Plains' long-term contracts plus the additional assurances by Valero Partners that it will not alter the Martinez terminal make the possibility of irreparable harm between now and a trial in January 2018 unlikely.

To repeat, Plains' long-term contracts prevent Valero Partners from restricting terminal services to any of Plains' existing customers during the course of this litigation (Opp. at 21; Lashway Decl. ¶ 19; Movafagian Decl. ¶ 19; Bailey Decl. ¶ 59, Exhs. 9, 10). These contracts secure storage and throughput for BP, Chevron, Tesoro, and independent third-party LPP traders AOT Energy and Musket Corporation, and protect a higher volume of gasoline and other LPPs than has been throughput from the Martinez terminal to the KMSA in any of the past seven years (Bailey Decl. ¶ 59, Exhs. 9, 10). The contracts are sufficient to stem concerns that irreparable anticompetitive harm will occur between now and trial.

To meet the concern that upon closing, defendants might alter the Plains terminal in such a way that, should divestiture be later ordered, it would be problematic, defendants have provided a declaration promising the following (Dkt. No. 75-3 at 1–3):

- All on-site employees, including management, have been offered and have accepted employment at their same current positions;

9

- Valero Partners commits to offer the only off-site manager, Cambyses Movafagian, employment at least until there is a decision on the merits in this action;

- Defendants will not alter the infrastructure at the Martinez terminal, with the exception of routine maintenance;

- To the extent that Valero Partners enters into any new contracts, or amends any contracts, it will include an explicit provision giving the customer and any divestiture buyer unilateral rights to terminate the contract with thirty days notice;

- Valero Partners will refrain from placing liens or encumbrances on the terminal that might become binding on a divestiture buyer;

- Valero Partners will implement a firewall to prevent disclosures to Valero of any confidential customer information; and,

- Valero Partners will otherwise operate the terminal in a manner substantially consistent with how Plains has historically operated it.

Defendants are **HEREBY ORDERED** to comply with all commitments set forth in their declaration as well as the following additional requirements:

- Valero Partners shall honor, without alteration or amendment, all existing contracts for storage at and throughput from the Martinez terminal;

- Only on-site terminal employees and Cambyses Movafagian, Plains' current Director of West Coast Terminals, shall have access to business and financial records of terminal customers, and any other confidential customer information. No officers or directors of any current Valero entity are permitted to possess or view such records.

These assurances will be sufficient to allay concerns that the Martinez terminal will become too intertwined with Valero Partners to disentangle the asset should a trial reveal that divestiture is required. Because interim irreparable harm is unlikely, California's motion for preliminary injunction is otherwise **DENIED**.

To be very clear, if permanent relief is granted and divestiture ordered, defendants will not be heard to complain about any reliance built upon the closing of the transaction. Defendants proceed entirely at their own risk if they close. So do third parties who deal with defendants in the interim between now and final judgment.

**CONCLUSION**

In light of the foregoing circumstances, California has failed to bear its burden to show that it will suffer irreparable harm in the absence of a preliminary injunction. Therefore, this order need not reach the balance of equities or public interest. Except as to the conditions set forth above, California's motion for preliminary injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 23, 2017.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE