Xavier Becerra
Attorney General of California
Kathleen E. Foote (SBN 65819)
Senior Assistant Attorney General
Paul Moore (SBN 241157)
Debbie Chiv (SBN 258362)
Brian Wang (SBN 284490)
Deputy Attorneys General
    455 Golden Gate Avenue
    San Francisco, CA 94102-7004
    Telephone: (415) 703-2372
    Fax: (415) 703-5480
    E-mail: paul.moore@doj.ca.gov

Charles M. Kagay (SBN 73377)
Wayne M. Liao (SBN 66591)
Suzanne Klotz (SBN 104593)
Spiegel Liao & Kagay
    388 Market Street, Suite 900
    San Francisco, California 94111
    Telephone: (415) 956-5959
    Facsimile: (415) 362-1431
    E-mail: cmk@slksf.com

Polly J. Estes (SBN 208196)
Estes Law Group
    1005 Northgate Dr., PMB #504
    San Rafael, CA 94903
    Telephone: (415) 376-9726
    Facsimile: (415) 532-1666
    E-mail: polly@appellateattorney.com

Attorneys for Plaintiff State of California ex rel Xavier Becerra

**\*REDACTED VERSION OF DOCUMENT FILED UNDER SEAL\***

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br>Plaintiff,<br><br>v.<br><br>VALERO ENERGY CORPORATION,<br>VALERO ENERGY PARTNERS L.P.,<br>and<br>PLAINS ALL AMERICAN<br>PIPELINE, L.P.,<br>Defendants. | Civil Action No. 17-cv-3786 (WHA)<br><br>**STATE OF CALIFORNIA'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: August 16, 2017<br>Time: 12:00 PM<br>Courtroom: 8 |

**Table of Contents**

I.  Introduction ....................................................................................... 1

II.  Statement of facts ............................................................................. 3

    A.  The parties .................................................................................. 3

    B.  The industry ............................................................................... 4

    C.  The proposed transaction ......................................................... 7

III.  The requirements for issuance of a preliminary injunction ....................... 8

IV.  The State is likely to succeed on the merits or, at the very least, raises serious questions going to the merits ............................................ 9

    A.  The proposed transaction would violate the Clayton Act ............... 9

        1.  Relevant Markets ............................................................. 10

        2.  The effect of the acquisition may be to substantially lessen competition ......................................................... 11

            a)  The acquisition may substantially lessen competition in the market for unconstrained terminaling services ...................................................... 11

            b)  The acquisition may substantially lessen competition in the market for LPPs sold in bulk ........................ 11

                (1)  The proposed acquisition threatens unilateral anticompetitive effects ................................. 14

                (2)  The proposed acquisition threatens coordinated anticompetitive effects ................................. 15

            c)  The proposed acquisition threatens to raise the retail price of motor fuels ................................................ 17

    B.  The proposed transaction would violate California Business and Professions Code § 17200 ............................................. 17

V.  The State is likely to suffer irreparable harm in the absence of a preliminary injunction ......................................................................... 18

VI.  The balance of equities tips sharply in the State's favor ......................... 19

VII.  The requested preliminary injunction is in the public interest ................. 19

VIII.  Conclusion ..................................................................................... 20

**Table of Authorities**

## CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)........................9

*Angelotti Chiropractic v. Baker*, 791 F.3d 1075 (9th Cir. 2015).........................................9

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016)............................18, 20

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)...............................................9, 10

*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163 (1999)...................................................................................................17, 18

*Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410 (5th Cir. 2008) ....................18

*F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001)................................................11

*Hawaii v. Standard Oil Company of California*, 405 U.S. 251 (1972)...........................2

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir.2000)......................20

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ...................................................................................19

*Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105 (2014) ......17, 18

*Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 43 (1998)...........................17

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ........................................................................................9, 10, 11

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011) .................................18

*State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147 (1988)..........17

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553 (1998) ......................17

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009)..............................................20

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ........................10

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) .............................10

*Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096 (9th Cir. 1999) ................. 19

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................... 8, 18

**STATUTES**

15 U.S.C. § 18 ................................................................................................... 9, 18

15 U.S.C. § 26 ........................................................................................................ 2

15 U.S.C. § 45 ...................................................................................................... 18

California Business and Professions Code § 17200 .............................................. 17, 18

**Motion for Preliminary Injunction**

Please take notice that on August 16, 2017, at 12:00 PM, or as soon thereafter as it may be heard, the State of California will move the court in the above-captioned action for a preliminary injunction.

The specific relief sought is an order enjoining defendants Valero Energy Corporation, Valero Energy Partners, L.P., and Plains All-American Pipeline, L.P. from consummating their proposed transaction, under which Valero would acquire assets of Plains including Plains' independent petroleum terminals in Martinez and Richmond, California.

## I.    Introduction

This case challenges a major petroleum refiner's proposed acquisition of ████ ████████████████████████████████████████████████████ But there is much more at stake than just who owns an industrial facility. This case is about whether millions of California and Nevada consumers and businesses will be threatened with supracompetitive prices for the gasoline and fuels they need for many years into the future.

The petroleum terminals in the San Francisco Bay Area are starting points through which almost all gasoline and diesel fuel sold in northern and central California and northern Nevada must pass. ████████████████████████████ ████████████████████████████████████████████████████ ███████████████ the Martinez terminal owned by defendant Plains All American Pipeline, is open to all sellers of petroleum products. Without the use of this terminal, only a small number of major refiners have unconstrained access to compete in the vast Northern and Central California and Northern Nevada petroleum products markets. If a major refiner were to take over this terminal, the move would potentially restrain competition in the terminaling market and, most importantly, in the downstream products

market, raising the prices of gasoline and diesel fuel for millions of citizens and businesses. And that is just what is threatened here.

In 2005, the major refiner Valero (which itself owns and operates one of the Bay Area's terminals) tried to acquire the independent terminals now owned by Plains. The Federal Trade Commission and the State of California opposed the merger because it would have greatly impacted potential downstream competition in the sale of petroleum products. Pursuant to a consent decree, Valero divested itself of the independent terminals. The consent decree recently expired, and Valero is now trying to re-acquire these terminals – raising the specter of the same deleterious competitive consequences that the consent decree forestalled in 2005.

Plaintiff the State of California brings this action to enjoin Valero Energy Corporation, Valero Energy Partners, L.P., and Plains All American Pipeline, L.P. from consummating their proposed transaction, under which Valero would acquire Plains' independent petroleum terminals in Martinez and Richmond, California. The State sues as parens patriae on behalf of its residents. *Hawaii v. Standard Oil Company of California*, 405 U.S. 251, 257-61 (1972). The State seeks this relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, which permits the court to issue preliminary and permanent injunctive relief against threatened loss or damage by a violation of the antitrust laws. The purpose of the preliminary injunction is to maintain the status quo and to prevent harm to competition until the legality of the proposed acquisition can be adjudicated.

## II.    Statement of facts

### A.    The parties

California is the second largest consumer of petroleum products in the United States, behind Texas.[1]  California's fuel market is unique in that the state is considered an "island" due to its geographic isolation from other U.S. refining centers.[2]  California lacks pipeline connectivity to refining centers outside the state, so its primary gasoline sources are refineries within the state.[3]

Defendant Valero Energy Corporation is an integrated petroleum refiner and marketer of petroleum products.  Declaration of John B. Hayes at 3.[4]  It produces gasoline and other refined products and markets them on a retail and bulk sales basis.  *Id.*  It operates a refinery in Benicia, California, and a proprietary petroleum terminal at the same location.  *Id.*  Valero Energy controls defendant Valero Energy Partners LP, which operates some of its assets.  Collectively, these two defendants will be referred to in this motion as "Valero."

Defendant Plains All American Pipeline, L.P. operates petroleum terminals and pipelines that carry light petroleum products (LPPs) such as gasoline, diesel and jet fuel.  Hayes Decl. at 3-4.  The Plains terminal in Martinez offers LPP services including storage, marine loading and unloading, and pipeline transport to a hub on the Kinder Morgan pipeline system located at Concord, California.  *Id.*

---

[1] Table C11. Energy Consumption Estimates by Source, Ranked by State, 2015, U.S. Energy Information Administration, https://www.eia.gov/state/seds/data.php?incfile=/state/seds/sep_sum/html/rank_use_source.html&sid=US (accessed July 20, 2017).

[2] "Why are California's Gasoline Prices Always Higher?" https://www.forbes.com/sites/judeclemente/2015/03/22/why-are-californias-gasoline-prices-always-higher/#5b039d8121ff

[3] *Id.*

[4] The State has filed a redacted version of this declaration, masking information from third parties that objected to the sharing of their information, pending the Court's resolution of these objections.

**B.    The industry**

The San Francisco Bay Area is home to five refineries:  Valero's Benicia refinery (Valero-Benicia), Chevron Corporation's Richmond refinery (Chevron-Richmond), Tesoro Corporation's Martinez refinery (Tesoro-Martinez), Phillips 66 Company's Rodeo refinery (Phillips 66-Rodeo), and Shell Oil Company's Martinez refinery (Shell-Martinez).  Hayes Decl. at 5. These five refiners, plus BP plc which ships product from its Cherry Point, Washington refinery into California, supply most of the LPPs used in Northern California and Nevada.   *Id.*



The Plains terminal's availability to a range of competing suppliers is a significant competitive resource. The terminal transports ███████████ barrels of LPPs to Concord Station annually. Hayes Decl. at 8. The Plains pipeline from the Martinez terminal also ships significant amounts of product from ███████████ without passing though the terminal. Hayes Decl. at 8. When these ████ shipments are added, the Plains pipeline transported ████████████ in 2015 and ████████ ████████ to Concord Station, destined for the Kinder Morgan service area, in 2016. Hayes Decl. at 8. ████████████████████████████████

Today, the Plains facility does in fact serve a range of competing suppliers. In 2015 and 2016, ████████████████████████████████████████ ██████████████████████ Hayes Decl. at 8. These companies chiefly use the volumes they transport through the Plains terminal and pipeline

to supply their retail gasoline and diesel stations.   Hayes Decl. at 8.   ████████

████████████████████████████████████████████████████████████

Valero also uses Plains to ship LPPs to Concord Station.   ████████████████

████████████████████████████████████████████████████████████

████████████████████

Importantly, the Plains facilities are a principal means for traders who are independent of the major refiners to transport LLPs into the Kinder Morgan service area. Traders are businesses that buy, sell and trade LLPs, rather than produce them. Hayes Decl. at 8-9.  Musket and AOT are independent traders that currently use the Plains terminal, and others have used it in the past.  Hayes Decl. at 9.

Valero's internal correspondence acknowledges how this makes independent suppliers dependent on the Plains Martinez facility to access the market.  In August 2016, Horner Bhullar Valero's Business Development office wrote:

> I'm trying to evaluate alternatives for spot customers at Plains' Martinez terminal, specifically, what is the risk of them going to another facility? For example, if this is the preferred location with attractive rates vs. other facilities and/or there is limited available terminal capacity in the area, then one could argue that even though spot customers are not termed up, there's limited risk of them taking their business elsewhere.

Declaration of Paul Moore in Support of Motion for Preliminary Injunction, Ex. A.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████   ████████████████   This practice can mitigate price spikes in gasoline and other fuels.  Hayes Decl. at 9.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████   Hayes Decl. at 9-10.  This is an alternative for these

companies, whose pipelines operate at capacity, and it might be the only alternative they have to supply significant incremental volumes of gas and diesel to their retail stations. *Id.* Transporting from refinery racks located outside the KMSA is likely not a good substitute for pipeline shipments, because truck transport is costlier than pipeline. Hayes Decl. at 9-10.

## C. The proposed transaction

The challenged transaction is Valero's second attempt to take control of the Martinez terminal. In 2005, Valero sought to acquire Kaneb Services LLC and Kaneb Pipe Line Partners, L.P. (collectively, Kaneb), the then-owner of the Martinez and Richmond terminals (and other assets). The FTC and the State challenged the proposed transaction. At that time, the FTC's complaint charged:

- "Valero L.P. and Kaneb compete in providing terminaling services for bulk suppliers of refining components, blending components, and light petroleum products in Northern California."

- "Northern California is a relevant geographic market."

- "The market for terminaling services for bulk suppliers of refining components, blending components, and light petroleum products in Northern California will be highly concentrated following the proposed acquisition."

- "Post-acquisition, Valero L.P. would have an incentive to increase light petroleum prices by restricting products moving into and through the three marine-accessible Kaneb terminals in Northern California."

- "The acquisition increases the likelihood of coordinated interaction among the remaining market participants by eliminating the terminal services provider with different incentives."

- "Entry into the market for Northern California terminaling services for these products would not be likely or timely . . . ."
- "The efficiency claims of the Respondents, to the extent they relate to any of these three markets with horizontal overlaps, are not cognizable under the Merger Guidelines, are small as compared to the magnitude of the potential harm, and would not be sufficient to reverse the merger's potential to raise the price of bulk supply and terminal services."

Moore Decl., Ex. B at 36179.

The FTC and State's competitive concerns were ultimately remedied by a 10-year consent decree under which Valero was required to divest itself of the Martinez terminal. Moore Decl., Ex. B at 36180. That is why the terminal today remains in the hands of an independent operator.

The consent decree having expired, Valero now seeks to undo it by re-acquiring the Martinez and Richmond terminals at its first opportunity. Pursuant to a September 29, 2016, Asset Purchase Agreement, Valero has contracted with Plains, the present owner of the terminals, to purchase assets including the Martinez terminal. A copy of the full Asset Purchase Agreement is Exhibit C to the Moore Declaration.

.

## III. The requirements for issuance of a preliminary injunction

A plaintiff seeking a preliminary injunction must establish: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Under the "sliding scale" approach applicable in the Ninth Circuit, the district court may balance the pertinent elements so that a stronger showing of one element offsets

a weaker showing of another. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (en banc); *Angelotti Chiropractic v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015). Under this approach, for example, a plaintiff may obtain an injunction where it has only shown "serious questions going to the merits" (the first element), if the balance of hardships (the third element) tips sharply towards the plaintiff, so long as it also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest (the second and fourth elements). *Alliance for the Wild Rockies*, 632 F.3d at 1135.

Here the State can readily establish all four criteria.

## IV. The State is likely to succeed on the merits or, at the very least, raises serious questions going to the merits

### A. The proposed transaction would violate the Clayton Act

Section 7 of the Clayton Act bars mergers or acquisitions "the effect of [which] may be to substantially lessen competition, or tend to create a monopoly" in "any line of commerce or . . . activity affecting commerce in any section of the country." 15 U.S.C. § 18. Judicial analysis under the statute necessarily focuses on "probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).

In this case, following careful study, the State's economic expert John B. Hayes has reached the following conclusion:

> My research in this matter has led me to conclude that the proposed transaction has the potential to harm competition by elevating the prices paid for gasoline, diesel and jet fuel sold in Northern and Central California and Nevada. The Plains terminal is an important access point for the distribution of refined petroleum products to this region, and a restriction on access to the terminal could reduce the supply of these fuels in the region and thereby cause elevated prices. Plains has no incentive to restrict access to the terminal because it has no direct interest in the prices of gas, diesel and jet fuel. In contrast, Valero is a large seller of these fuels and might earn greater profits if access to the terminal were restricted.

Hayes Decl. at 2-3.  The reasons for this conclusion are explained in detail in Dr. Hayes' declaration and are summarized below.

### 1.  Relevant Markets

An economic arrangement between firms performing similar functions in the production or sale of comparable goods or services is characterized as horizontal.  *Brown Shoe*, 370 U.S. at 334.  An economic arrangement between companies standing in a supplier-customer relationship is characterized as vertical.  *Id.* at 323.  The merger contemplated here is both.  Valero operates a terminaling service similar to the one it wants to acquire from Plains, but also is a customer of Plains' terminaling service.

Challenges to both types of merger require examination of the "relevant market." *Brown Shoe,* 370 U.S. at 324.  Courts assess whether a transaction violates Section 7 by determining: (1) the 'line of commerce,' or relevant product market; (2) the 'section of the country,' or relevant geographic market, and (3) the merger's probable effect on competition in the relevant product and geographic markets. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618-23 (1974).

An analytical method often used by courts to define a relevant market is the "hypothetical monopolist" test – asking hypothetically whether a monopolist could theoretically impose small but significant and non-transitory increase in price on a product in the market sold by one of the merging firms.  *Saint Alphonsus,* 778 F.3d at 784; *United States v. H & R Block, Inc.,* 833 F. Supp. 2d 36, 52 (D.D.C. 2011).

The State's expert economist has identified two relevant markets to be analyzed for the possible competitive effects of the merger.  The first, with a geographic range of the San Francisco Bay Area, is the market for unconstrained terminaling services that enable pipeline transport of LPPs to the KMSA.  Hayes Decl. at 13. The second, with a geographic range encompassing the region served by the Kinder Morgan pipeline system originating in Concord, California, is the market for LPPs sold in bulk.  Hayes Decl. at

14. The hypothetical monopolist test indicates that both are potential relevant markets for the purpose of antitrust analysis. Hayes Decl. at 14.

### 2. The effect of the acquisition may be to substantially lessen competition

#### a) The acquisition may substantially lessen competition in the market for unconstrained terminaling services

With respect to the first relevant market – the market for unconstrained terminaling services – the proposed acquisition is a horizontal merger. Both Valero and Plains own and operate such a facility. In analyzing the effects of a horizontal merger, a commonly used metric is the Herfindahl–Hirschman Index ("HHI"). *Saint Alphonsus*, 778 F.3d at 786. HHI is calculated by summing the squares of the individual firms' market shares," which "gives proportionately greater weight to the larger market shares. *Id.*

Today, the participants in this market are ███████████████████ Valero-Benicia, and Plains-Martinez, and the latter two would be combined by the acquisition. The HHI for the subject market is ██████████████ before the acquisition and would be ████████████ following the acquisition. Hayes Decl. at 19. A market is considered "highly concentrated" if its HHI is above 2500. *Saint Alphonsus*, 778 F.3d at 786. Where, as here, the mergers would increase the HHI more than 200 points and result in a highly concentrated market, it is "presumed to be likely to enhance market power." *Id.* This makes out a prima facie case that a merger is anticompetitive. *Id.*, citing *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001).

#### b) The acquisition may substantially lessen competition in the market for LPPs sold in bulk

The market statistics for the terminaling services market are indicative of the potential loss of competition, but the most worrisome aspect of the proposed acquisition

is its likely effect in the market for LPPs sold in bulk in Northern California.  This is the market that ultimately supplies motor fuels to millions of California consumers and businesses, and the acquisition threatens to elevate the price of these critical commodities above competitive levels.

Intuitively, the loss of the one independent terminal in the Bay Area –a critical link in the path from the Bay Area, where virtually all the LPPs sold in Northern California originate or are delivered to the vast Kinder Morgan service area – is likely to lessen competition in the sale of LPPs significantly.  Detailed economic analysis corroborates this intuition.

The obvious reason for the likely effects that the acquisition might have on the LPP market is the different positions Plains and Valero occupy in that market.  Hayes Decl. at 10.  Plains has no direct interest in the price of LPPs because it does not sell them. *Id.*  Plains' business interests are served by encouraging use of the terminal.  Because it does not sell LPPs, it would not have an incentive to restrict access to the Plains terminal or to elevate LPP prices at that terminal or in the KMSA.  Hayes Decl. at 10-11.

For example, Plains' Director of West Coast Terminals testified:

Q   Like bulk supply at Concord, the prices for bulk supply, if those go up, what effect does that have on your pricing?

A   I have no idea.  I don't deal with that pricing at all.

Q   Do you look at the price of bulk supply at Concord?

A   I do not.  I do not have the time to look at that.

Moore Decl. Ex. D, Movafagian testimony 34:7-15.

Valero, unlike Plains, does sell LPPs in bulk at Concord Station and at retail throughout Northern California.  Hayes Decl. at 1.  It profits directly from such sales.  Unlike Plains, Valero stands to profit from a restriction on access at the Martinez terminal that reduces supply flowing into the downstream market.  Hayes Decl. at 10-11.

The critical distinction between an independent terminal and one that is controlled by a refiner has not been lost on Plains' customers. Plains' Director of West Coast Terminals testified:

> Q    You mentioned earlier that you had talked to some customers about the sale.
>
> A    Mm-hmm.
>
> Q    Did any of them mention that they were upset that it was Valero that was selected as the buyer?
>
> A    They were upset that we were selling, but the fact that it was Valero, I don't think they were upset about that. They were upset that it was not an independent terminaling company that was buying it.

Moore Decl. Ex. D, Movafagian testimony 148:18-149:3. Additionally, Plains customers signaled their concern by trying to lock in future access with new contract. Hayes Decl. at 21.

Furthermore, it is likely that only Valero, ███████████ can transport significant incremental volumes of LPPs to Concord Station and beyond without using the Plains terminal. Hayes Decl. at 11. ████████████████████████ ██████████████████████████████████ ████████████████

This makes the Plains terminal critical to LPP prices. Normally, in a competitive market, firms will respond to price spikes by increasing the quantity they make available for sale. Hayes Decl. at 11. Increasing the quantity available for sale mitigates the price increase and moves the market back into equilibrium. Hayes Decl. at 11. If the proposed acquisition goes through, Valero will have direct control over the ability of ████████ ██████████████████████████████████ ███████  *Id.* But Valero, which could profit from a price spike because it (unlike Plains) is a seller of LPPs, might well find its own interest served by restricting the access of its competitors. *Id.*

The likely anticompetitive effects of the proposed acquisition arise it two ways. The first is through unilateral actions – that is, actions Valero will be able to take on its own. Valero would be motivated to take such actions because it (unlike Plains) is a seller in the LPP market, and so can profit by a rise in LPP prices. The second way anticompetitive effects can arise is through coordinated actions among Valero and a small set of competitors. These arise because the proposed acquisition gives a very limited number of sellers unconstrained access to the market, so that express or tacit collusion or parallel action – all of which could raise prices – becomes significantly more likely.

### (1) The proposed acquisition threatens unilateral anticompetitive effects

As the owner of the Plains terminal, Valero would have two completely different economic interests in its operation. Valero's total profits would depend not only on the use of the terminal, but also on the prices it could charge for LPPs in bulk and at retail downstream. Hayes Decl. at 11-12. Valero can be expected to manage the Plains terminal with recognition of the effect that the LPP volumes transported through the terminal will have on bulk supply prices at Concord Station and on retail prices in the Kinder Morgan service area. Hayes Decl. at 11-12. Consequently, Valero may have an incentive to restrict access to terminaling services at the Plains terminal if doing so would elevate the prices for LPPs downstream or enable Valero profitably to increase its LPP sales. Hayes Decl. at 12.

There are two countervailing ways restricting access to terminaling services could affect Valero's total profit. First, such a restriction would reduce the profit Valero's earns from terminaling services – although even this reduction could be mitigated if Valero finds a new use for terminaling capacity, such as storage and transmission of its own LPPs destined for marine shipment outside the Bay Area. Hayes Decl. at 12. Indeed, Valero

appears to be planning increased exports out of California as an important use for the terminal. Hayes Decl. at 22-23.

Second, at the same time, restricting access to terminaling services would increase Valero's profit from LPP sales in multiple ways. A restriction would decrease the supply of LPPs at Concord Station, where Valero sells LPPs, and thus tend to elevate their prices and increase Valero's sales. Hayes Decl. at 12. Farther down the supply chain, the restriction would elevate retail prices in the Kinder Morgan service area, where Valero sells at retail. *Id.*

Detailed economic analysis indicates that these pricing effects likely would not be mitigated by an expansion in supply from other suppliers in the market. Hayes Decl. at 25-26. The few remaining suppliers with unrestrained access to the market following the acquisition, who would also profit from higher prices, would likely not have an economic incentive to expand supply to the extent that it had been restricted. *Id.* Similarly, LPP suppliers who do not presently service this market cannot be expected to be able to introduce additional supply. Hayes Decl. at 27. Contemporaneous documents from market participants, including Valero, are consistent with these conclusions. Hayes Decl. at 26-27.

### (2) The proposed acquisition threatens coordinated anticompetitive effects

Coordinated action is conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others. Hayes Decl. at 31. The proposed acquisition raises the serious possibility of coordinated actions that impair competition and raise prices to purchasers of gasoline and other fuels. Such effects can result from explicit agreement among competitors, tacit agreement, or even just parallel conduct – all of which the acquisition makes more likely. Hayes Decl. at 31-32.

Today, coordination to restrict supply and raise prices in the Kinder Morgan service area is unlikely. This is because the Plains terminal affords all eight suppliers serving the market unconstrained access. Hayes Decl. at 32-33. Any one of them could increase its shipments to the Concord Station by way of the Plains terminal, making it unlikely that competitive actions could be coordinated or that such coordination could be sustained.

In contrast, as is explained above, if the proposed acquisition were to take place, only three sellers – ███████ and Valero – would have control over unconstrained access to the Concord Station and the market beyond. In such a circumstance, coordinated action is far more likely, for several reasons.

First, if only a few competitors are able to undercut a supply reduction, each is more likely to profit from maintaining the restriction. Hayes Decl. at 33. Consequently, the chances of a competitor deviating from the coordinated action is reduced. *Id.* Second, limiting the number of suppliers that could increase supply makes the response of rivals more predictable. If there are only three suppliers that can increase supply, each is better able to predict the actions of the others. Hayes Decl. at 33-34.

Third, the Northern California LPP market is particularly susceptible to such coordination. Bulk prices are reported through a public reporting service, so prices are observed. Hayes Decl. at 34. Also, because LPPs are homogeneous products, any one of the coordinating companies would stand to gain little from undercutting its rivals, and therefore has little incentive to do so. Hayes Decl. at 34-35. Finally, the demand for LPPs is fairly unresponsive to changes in price, so that a small restriction could lead to a large increase in price, making coordinated action particularly profitable. Hayes Decl. at 35.

### c) The proposed acquisition threatens to raise the retail price of motor fuels

Thus far, the discussion has centered on bulk prices for LPPs. It is important to keep in mind, though, that in the end any elevation in prices will mostly fall on the end consumer of gasoline and other fuels. Increases in wholesale LPP prices are generally fully passed through to retail LPP prices. Hayes Decl. at 10.

### B. The proposed transaction would violate California Business and Professions Code § 17200

California does not have an express statutory prohibition of anticompetitive mergers or acquisitions. *State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147, 1169 (1988). It does, however, have a more general statute under which a court may enjoin "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Although § 17200 was previously held not to apply to a merger because it did not prohibit a single transaction, the statute has since been amended to remove that limitation. *Texaco*, 46 Cal. 3d at 1169-70; *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 570 (1998).

Under its "unlawful" prong, section 17200 "borrows" violations of federal, state, or local law and treats them as unlawful practices that are independently actionable under § 17200. *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003). In particular, a § 17200 action may be predicated on a violation of an antitrust statute. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 43 (1998).

Under the "unfair" prong of the statute, a business act or practice is unfair when the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1133–34 (2014), quoting *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 187 (1999).

The California Supreme Court in *Cel-Tech* likened the "unfair" prong of § 17200 to FTC Act § 5 (15 U.S.C. § 45), which likewise prohibits unfair methods of competition. Section 5 may also be used to attack mergers that threaten to substantially lessen competition. *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 420 (5th Cir. 2008).

To establish an unfair business act or practice under § 17200, a plaintiff must show the unfair nature of the conduct and that the harm caused by the conduct outweighs any benefits that the conduct may have. *Prakashpalan,* 223 Cal. App. 4th at 1134, citing *McKell v. Washington Mutual, Inc.,* 142 Cal.App.4th 1457, 1473 (2006). The foregoing analysis of the merger under 15 U.S.C. § 18 establishes that, even if it did not rise to the level of a violation of that statute, it would at the very least constitute an unfair practice that must be enjoined under § 17200.

## V. The State is likely to suffer irreparable harm in the absence of a preliminary injunction

"A lessening of competition constitutes an irreparable injury under [Ninth Circuit] case law." (*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016). A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be rendered." *Id.,* quoting *Winter*, 555 U.S. at 22. While "likely" is a higher threshold than "possible," plaintiff need not prove that irreparable harm is certain or even nearly certain. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011).

In the long run, the irreparable harm that will be suffered will be increased prices paid by Northern California consumers and businesses as a result of diminished competition in supplying LPPs. These victims will have no mechanism for recovering the extra money they will have to pay for what is, for most people, a necessity of life.

Such effects might not be felt during the pendency of this action, but a failure to issue a preliminary injunction will nevertheless result in irreparable harm. Once the contemplated acquisition is set in stone, ███████████████████████████ ████████████████████ and the market will be headed inexorably down a path that is likely to expose consumers and businesses to supracompetitive fuel prices for years to come.

## VI. The balance of equities tips sharply in the State's favor

To determine the way the balance of hardships tips, the court must identify the potential harm caused by the preliminary injunction versus the possibility of the harm caused by not issuing it. *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). Generally, the balance of equities tips toward plaintiff where the harms it faces are permanent while defendants face only temporary delay from the issuance of a preliminary injunction. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014).

This is precisely the situation confronting the court today. Once the last independent petroleum terminal in the Bay Area is lost, there is no viable alternative on the horizon. On the other hand, it is difficult to discern a significant harm to defendants from a delay in the transaction until this case has been tried. Valero has long been a customer of the Plains terminal. Hayes Decl. at 9. There is nothing to keep it from using the terminal to whatever degree it wants until this case is completed.

## VII. The requested preliminary injunction is in the public interest

If the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the

district court grants the preliminary injunction. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Because their central purpose is to preserve competition, the antitrust laws recognize competition as "vital to the public interest." *Boardman*, 822 F.3d at 1024, citing *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir.2000).

This is the prototypical public interest case. It is not the typical situation of one business suing to gain or preserve an advantage over another. This is the State's chief law enforcement officer trying to protect its citizens and businesses, and the welfare of most citizens and businesses in the northern half of California is at stake. In the public interest, the court should not allow the transaction to proceed until its effects can be fully assessed on a complete record at trial.

**VIII. Conclusion**

Valero's proposed acquisition of ███████████████████████ ████████████████ threatens profound consequences for the California public. Even on the incomplete record available at this early stage of the litigation, it is clear that the deal runs afoul of the Clayton Act because it may substantially lessen competition; that the public will be irreparably harmed once this independent terminal becomes just another part of a major refiner; and that any delay in consummation of the transaction will have little if any effect on defendants' operations. For all these reasons, a preliminary injunction should be granted to preserve the status quo until all the complicated issues this action raises can be fully aired at trial.

Dated: Jul 24, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General
KATHLEEN E. FOOTE
Senior Assistant Attorney General

/s/ Paul A. Moore
PAUL A. MOORE III (SBN 241157)
Deputy Attorney General

Attorneys for Plaintiff State of California

I attest that concurrence in the filing of this document has been obtained from the signatory.

/s/ Charles M. Kagay
Charles M. Kagay