IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA,

    Plaintiff,

  v.

VALERO ENERGY CORPORATION,
VALERO ENERGY PARTNERS LP, and
PLAINS ALL AMERICAN PIPELINE, L.P.,

    Defendants.

No. C 17-03786 WHA

**ORDER SEALING PORTIONS OF ORDER RE PRELIMINARY INJUNCTION**

On August 23, an order denying plaintiff the State of California's preliminary injunction subject to certain conditions was filed with redactions (Dkt. No. 79). A companion order stated that the Court was inclined to file an entirely unredacted version of the order re preliminary injunction, but gave the parties an opportunity to object (Dkt. No. 80).

The parties to this action, and third parties whose information was included in the order have since filed objections to unsealing. An order considered and denied defendant Plains All American Pipeline, L.P.'s objections (Dkt. No. 83). This order now considers all remaining objections, which were lodged by third-parties Kinder Morgan, Inc., Andeavor (formerly Tesoro Corporation), and Shell Oil Products U.S.

In this circuit, courts start with a "strong presumption in favor of access" when deciding whether to seal records. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). To seal judicial records in connection with a preliminary injunction motion, the moving party must provide "compelling reasons supported by specific factual findings," which outweigh the

public's interest in disclosure. *See id.* at 1178–79 (quotations and citations omitted); *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1102 (9th Cir.) (applying "compelling reasons" standard to preliminary injunction). Compelling reasons may exist to seal "sources of business information that might harm a litigant's competitive standing." *See Nixon*, 435 U.S. at 598; *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 727 F.3d 1214, 1221–22 (Fed. Cir. 2013) (applying the law of our circuit).

At issue here are the capacities of gathering lines running from East Bay petroleum terminals to a hub called Concord Station that ships those petroleum products throughout Northern California and Northern Nevada. This is an antitrust action concerning potentially anticompetitive control of these gathering lines (*i.e.* excessive control vested in one company), and therefore the public has an interest in knowing how much access companies have to these gathering lines, and by extension the petroleum products markets in Northern California and Northern Nevada.

### 1. KINDER MORGAN.

Kinder Morgan, which owns four of the seven gathering lines at issue, argues that its gathering line capacities, and its infrastructure in general, are trade secrets, which are deserving of protection (Dkt. No. 85 at 2–3). This argument is unpersuasive. "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives [it] an opportunity to obtain an advantage over competitors who do not know or use it." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972) (quotation omitted). A prototypical example of a trade secret is, for example, the formula for Coca Cola. Other proprietary systems or formula that are not publicly known also fit within this category. *See, e.g.*, *Finjan, Inc. v. Proofpoint, Inc.*, 2016 WL 7429304, at *3 (N.D. Cal. Feb. 9, 2016) (Judge Haywood Gilliam, Jr.) (finding technical information about operation of products, licensing agreements, and fee structures can be trade secrets). Kinder Morgan's statements designating its infrastructure as a trade secret, however, are wholly conclusory, and do not explain why its pipeline capacities fit within this category. It is not enough to simply say that they are unknown to the public. *See U.S. Ethernet Innovations, LLC v. Acer, Inc.*, No. C 10-3724 CW, 2013 WL

4426507, at *2 (N.D. Cal. Aug. 14, 2013) (Chief Judge Claudia Wilken). Kinder Morgan has not shown that the capacities of its pipelines are trade secrets.

Nor is Kinder Morgan's argument that unsealing will harm its competitive standing compelling. It first argues, in a conclusory manner, that because the pipelines at issue are "at the core of Kinder Morgan's business operations" and it keeps pipeline capacities confidential, maintaining this confidentiality will prevent harm to its competitive standing (Dkt. 85 at 4). An order instructed Kinder Morgan to specify by name the competitors it claimed would benefit from disclosure of its gathering line capacities in the Bay Area, and how, in particular, this disclosure will harm Kinder Morgan (Dkt. No. 86). In response, it named only one other company with pipelines in the Bay Area, Chevron, which operates a proprietary pipeline shipping only Chevron product (Dkt. No. 91 at 1). Chevron, it bears noting, has not objected to the unsealing of its own pipeline capacity, and Kinder Morgan does not elaborate on how Chevron's knowledge of Kinder Morgan pipeline capacities will cause it competitive harm.

Kinder Morgan also notes that under the Interstate Commerce Act ("ICA"), it is not permitted to divulge information about its customers' petroleum shipments (Dkt. No. 91 at 2 citing 49 U.S.C. 15(13)). As Kinder Morgan acknowledges, however, there is an exception when disclosure is required by a legal proceeding, as it was here when Kinder Morgan provided this information subject to an investigative demand (Dkt. No. 85 at 1). Therefore, the ICA did not prohibit Kinder Morgan from providing this information, and the ICA does not apply to a court's subsequent use of the information. Short of a finding that other third parties will suffer competitive harm as a result of disclosure, there is no reason to seal this information. Given an opportunity to object to the disclosure, only one of Kinder Morgan's customers, Shell, did so (which objection is analyzed below). Kinder Morgan has failed to carry its burden to provide compelling reasons why sealing is warranted.

### 2. ANDEAVOR.

Andeavor owns two gathering lines, which it uses to deliver petroleum products to the Concord Station. It has explained that at times it pays competitors for use of their gathering lines when its own are operating at capacity, or are for some reason inoperable (Dkt. No. 99 at

3

1  2). To use competitors' gathering lines, Andeavor must purchase product from a refiner that is
2  connected to one of those gathering lines. If the capacity limits of its gathering lines are known,
3  Andeavor argues, its bargaining power will be weakened when it turns to other refiners to make
4  up for shortfalls.

5  Andeavor's reasoning is flawed. Just because a competitor knows its gathering line
6  capacity limits does not mean the competitor knows how much product Andeavor needs to
7  purchase to replace a shortfall. To know that, the competitor would also need to know the size
8  of Andeavor's orders, and any other petroleum reserves it can draw on to fill those orders. In
9  any event, since Andeavor has represented that it purchases product from competitors only
10 when it is unable to fulfill its contracts using its own gathering lines (*id.* at 2), competitors are
11 aware that it is operating at capacity when it makes a purchase. It is unclear how their knowing
12 the capacity of Andeavor's gathering lines could cause Andeavor any additional competitive
13 harm. Andeavor has not provided a compelling reason why its gathering line capacity should
14 be sealed.

### 3. SHELL.

16 Shell, by way of contrast, has provided a compelling reason why its gathering line
17 capacity should be sealed. It has identified at least one downstream customer whose purchases
18 represent a substantial part of Shell's Bay Area sales (Dkt. 100 at 1–2). If that customer learns
19 how much product Shell is capable of delivering, it will have substantial bargaining leverage
20 over Shell because it will know the financial impact purchasing from another source will have
21 on Shell, and thus be in a strong position to demand lower prices (*Ibid.*). This is the sort of
22 disclosure that poses a risk of harm Shell's competitive standing in the market. *See Nixon*, 435
23 U.S. at 598; *U.S. Ethernet Innovations*, 2013 WL 4426507, at *4.

24 Accordingly, Shell's motion to maintain its gathering line capacity under seal is
25 **GRANTED**. Granting this motion, however, poses a dilemma. The chart of gathering line
26 capacities at issue includes both the barrels per day each party is capable of piping, and the
27 percentage of total gathering line capacity, across all seven lines, occupied by each party.
28 Therefore, if all but Shell's information is unredacted, Shell's throughput capacity will likewise

be revealed. In order to preserve Shell's capacity under seal, other capacities must also be maintained under seal. Accordingly, only the Plains and Valero gathering lines — the lines used by the parties in this action — will be unredacted. The others will remain under seal. An order embodying these redactions will be filed on the public docket.

**IT IS SO ORDERED.**

Dated: September 15, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE